The next case is United States v. Rivera. Yes, whenever you're ready. I don't want to put your name so I'll just say Thomas, whenever you're ready. Good morning, may it please the court. My name is Thomas Marigliano and I'm appearing on behalf of the appellant Jason Rivera. I'd like to reserve three minutes for a bottle. Thank you. This was a six day trial with no physical evidence, no forensic evidence, and no cell site or location data, placing Mr Rivera in Philadelphia on the date of the crimes. The only surviving victim testified, there were there were three co conspirators who testified. That is correct. I guess what I'm referring to is objective evidence. There was no objective evidence tying Mr Rivera to the crimes, nor placing him in Philadelphia on the date of the crimes. But there was testimonial evidence of three co conspirators who knew Mr Rivera. That's correct. And in fact, this case was almost entirely rested on on testimonial evidence of those co conspirators. And therein lies the problem, because what the government did is the government relied on in order to essentially bolster the credibility, which I would submit was attacked thoroughly. And doubt was cast on the story that was told by all of these co conspirators because all of all of the stories were different. There was no linear story told by these three individuals. So I would submit that credibility was an issue. And I understand that that's not necessarily for this court's consideration, but it is relevant when we consider whether or not the errors in this case were harmless. And credibility is not an issue. Well, what I mean is it's maybe not necessarily for this court's consideration because it's not an issue raised other than what I submit is for the sufficiency of the evidence. But when we narrow the issues, the most important issues and the issues that this court has has asked to focus on are the jurisdictional sufficiency of the kidnapping charges, which is Section 1201, as well as what I was saying before, which is that the government bolstered, essentially, the credibility of these other co-conspirators with the improper evidence. The first of which was the improper weight testimony, and the second of which was the police scanner testimony, which the government has already conceded was improper. Now, if I may, I'd like to begin with the interstate element, because in my view, it's both the narrowest legal question. Hang on on the cross-racial identification. Why don't you call an expert on the unreliability of cross-racial identifications? I guess I don't really have a good answer for that, but I will note that for purposes of the record, the district court didn't even consider, in its opinion, the cross-racial identification aspect of the weight. And notwithstanding, I'm not familiar of any requirement that a witness be called to testify or an expert witness be called to testify as to cross-racial identification. I think that there's a litany of information, a litany of literature that's discussed in several opinions in several different courts that this is an issue for the court to consider, notwithstanding any expert testimony. Because there are treatises that are cited in the cases, and I cited some of those cases in the briefs. So I don't, respectfully, I don't think that expert testimony was absolutely necessary. But putting that aside. Even the government conceded the identification procedure was somewhat suggestive. And the question comes down to whether the evidence was nonetheless reliable. Right. I agree. And I would submit that the district court, what happened here, was that the district court improperly weighed the evidence before it. Gave much more weight to the, I guess, favorable aspects of the testimony of the two witnesses, and really disregarded some of the most important discrepancies. For example, the district court relied on Mr. Wynn's testimony that, or excuse me, the government's argument that this was one of the most memorable nights of Mr. Wynn's life. But that is contrary to Mr. Wynn's actual testimony. What he said was he specifically sought to forget these events. It was obviously very traumatic. I mean, there's no doubt that the allegations and what happened there was a terrible event. But the question is, should the court, the district court have relied on the testimony of Mr. or the government's argument, credited the government's argument that Mr. Wynn remembered this because of how terrifying the incident was when Mr. Wynn himself says that he sought to forget. And I think that when you really pair that with the four year delay, we can see how unreliable it is. But I think even more importantly, this was an identification that was cued to Mr. Wynn. It was not an identification that he just he made on independent memory. He didn't do that whatsoever. In fact, when he was shown the first picture of Mr. Rivera, whom we know to be Mr. Rivera, for sure, because it was his New York State driver's license. He said he didn't know that individual. But when later shown and there's obviously some dispute in the record as to what the picture was, because the government never proffered that picture at trial or at the wait hearing for that matter. But what happened was that the special agent who interviewed Mr. Wynn showed him the photo from his phone. This was a mission he made on the stand and that that photo was supposed to be have been zoomed in on. And when he zoomed in on that on that picture, that was it was it was only to to isolate Mr. Rivera and the individual in that picture with the glasses. And that's an important point, because what what description did Mr. Wynn give to the FBI prior to making the identification? He said this was a Mexican guy with glasses. That was it. And the Mexican guy with glasses was, I guess. The person in the photo, but not necessarily Mr. Rivera, but not necessarily an identification by Mr. Wynn of Mr. Rivera, based on the unduly suggestive part. Right. And I understand the United States is not pressing that argument. So is there is there independent relevance of that to the totality of circumstances test that we have to apply at the second step? I believe there is. And I don't think that they're mutually exclusive because if it was suggested, I think that the level of suggestiveness is something that the court should have considered because there are the cases are legion in which, you know, there's a show up, for example, which courts have found, including this court, I found that the show ups are inherently suggestive. So there's some level of suggestiveness right in something like that. And then that has to be weighted. I think the judge did. I mean, I think all the judges will like spot you suggest suggestiveness. I think the government will spot you suggest suggestiveness, but the issue really is reliability. But I think that the level of suggestiveness colors, whether or not it was reliable, because when we take the totality of the circumstances, right, the more suggestive the identification procedure was right. So all of the other factors that are considered in terms of reliability, right, become a little bit watered down to some extent, right, because if if this was cued by the FBI, especially after a failed identification, right, and then we consider some of the some of the weaknesses in the courts, the district courts and reliability analysis, I think that that's where that's where the courts error becomes most clear. What are those weaknesses? Okay, so the weaknesses. The first thing is what I mentioned before, which is that Mr. Wynn, Mr. Wynn's own testimony was contradictory to what the district court found. He didn't remember it because he tried to forget it. He said that, if I may. So the cross racial component that was never even considered. That was not the district court didn't even mention that, in its opinion. And in this case, this was so clear that there was a cross racial problem because Mr. Wynn himself said they look the same. He asked why did you refer to him as Mexican or Spanish when he ultimately ended up not being Mexican. Well, Mr. Wynn's comment was they look the same. They are the same. And I think that that's highly relevant. And then the four year delay. I don't think enough weight was given to the four year delay, because even the government concedes that the cases it cites in support of its position was do not involve such a significant delay. So when you couple the suggestive and I would, I would submit that the suggestiveness was extreme in this particular case, given the circumstances and I hate to be hyperbolic but that's, that's the way I view it. The suggestive was so true and then when you when you couple that with the four year delay, and the cross racial identification component, and the contradiction between the testimony of Mr. Wynn, and the government's position, the totality of circumstances cannot. Let's assume you're right, just for the sake of argument, in connection with the identification that it was somehow unduly suggestive, so much so that it should be should have been suppressed. Let's assume that the scanner evidence and the statement made at the closing should not have been made, and that was incorrect. How do you nonetheless get around that there are three co conspirators who dealt with this individual, and testified directly at trial that he was part of the group that went from New York to Philly, and two people got killed a third person almost got killed. Because I would submit that there's an inherent inherent skepticism, that's that that is required when we look at the testimony of any co conspirator, I mean, I'm understood and you and you obviously ended that point was made at trial and it didn't didn't win. How can we as an appellate court, say that that's not enough. I mean, it's, it seems like it's overwhelming. See, I would respectfully disagree that it was overwhelming and the reason it would be over, it's not overwhelming is because of what I mentioned earlier, which is that there was no linear story, it wasn't like these weren't simple discrepancies between testimonial. I, I guess the best way to describe it. This is not just, you know, oh I forgot one minor details and I forgot another minor detail versions of different stories but in the end, they were there. When three people were taken down to the school. So when we break it down even further, in terms of there not being a linear story or consistent story amongst the three witnesses. I think that the most relevant part of that is that Mr. Rivera's conduct itself was never made clear. Everyone testified to Mr. Rivera doing something different. And that is not enough to meet the heavy burden of proof beyond a reasonable doubt, especially when we consider the cumulative errors that occurred in the case. What did the government charge Mr. Rivera with? They charged him with conspiracy to commit kidnapping, two counts, two of which resulted in death, well three counts, excuse me, two of which resulted in death. One of which was, which I would submit is actually relevant to the, to the interstate nexus analysis because even the testimony about what they intended to do when they went down to Philadelphia was that they went down to beat them up and collect the debt. Which he, Mr. Rivera was also charged with conspiracy to collect an extortionate debt as well as the substantive offense. But if we look at Mr. Dow's testimony, which is cited by the government, he says that even when asked pointedly by the government, was there any discussion about kidnapping one of these people? He says yes, and then he was asked, tell us about that. And he says, quote, Lamb said that he wanted to speak to the little kid. So do what we had to do, collect the money and then bring the kid back to New York. So even if the most we give that testimony, the most generous reading, the interstate nexus element is not satisfied because it only, at least with respect to the two kidnappings resulting in death. That may be the government's strongest argument that there was an interstate nexus. They went across state lines for the purpose of a kidnapping, right? And then back to New York. Exactly. But there has to be that purpose before they actually travel because it has to be in the commission of the crime or in furtherance of the crime. But but the discrete crime, your honor, we're going to collect the debt for the purpose and and probably do a kidnapping, supposedly not to result in murder. It did, but it's kind of tough to say that they didn't go across state lines for the purpose of doing a kidnap. Well, see, that's where I respectfully disagree, because, again, I would concede that the government proved that they traveled in interstate commerce. If we give the government every reasonable inference, right, I would agree that the government probably proved that they traveled in straight lines to collect an extortionate debt. That is different than the substantive and the conspiracy to commit kidnapping, because, again, the proof that the government is relying on, even in its brief, which I just cited, does not say anything about kidnapping. The two individuals whose death ultimately which in which is crime ultimately result in their deaths. So that alone would, at the very least, knock out those counts, because even if there was a conspiracy, again, giving the government the most generous reading, even if there was a conspiracy to commit a kidnapping, it would have to only have been the kid who did not die. And then not only that, this statement that's made, he's putting collect the money prior to taking the kid back to New York. If we look at 1201, 1201 requires that the kidnapping be done in furtherance of receiving some benefit. So if you already received the benefit and then do the kidnapping after, it's not a kidnapping, at least not a federal kidnapping, maybe a state kidnapping, but that's a different issue for a different day. But for today, the federal kidnapping, the elements are not met, either by the sufficiency of the evidence in general or with respect to that interstate nexus. Okay, let's hear from the government. Thank you. Bring you back on. Thank you. Thank you. Good morning. Please support Robert Salzman on behalf of the government, beginning with the identification issue. The important issue here is that this the question is, does the matter go to the jury? My new friend, Mr. Morgan, I know makes very good points, as he did to the jury about why you could question this particular identification taking place four years after the event in question by somebody who didn't know Mr. Rivera previously, but the government has equally compelling points, which I'm happy to get into the question under the Supreme Court precedent is does admitting this evidence present a substantial chance of irreparable misidentification. And if that's not the high standard that's met, then what we're left with is an issue for the jury. And that's what I would respectfully suggest Judge Ambrose, you know, very carefully explained in one of the leading decisions in this area. In the Brownlee case 20 years ago, where there you had, now it wasn't a four year gap like we have here, of course, but we had there was a 30 second carjacking, in which the victim admitted that of course she spent those 30 seconds, mainly looking at the offender's gun, and not at the person. And yet, this court held, it was broad daylight. It was 30 seconds there was ample time. It was an issue for the jury. This court said it went to the weight of the evidence. And what we have here, with respect to Mr. Nguyen, is there was a pretrial hearing. The court Judge Prater heard from Mr. Nguyen and found him credible. I would suggest that the standard of review therefore here, it's abuse of discretion, of course, with respect to the admission of this evidence, but it really gets us into clear error territory, because this is a factual determination that Judge Prater made. She credited Mr. Nguyen that he remembered those days, that he had reason to remember those days, and that he was credible in making this identification. I take your adversary to say that at some point, the unduly suggestive nature of an identification can so infect the totality of circumstances that you don't really ever move to step to of the analysis. Do you think that's correct? Well, it's certainly not correct, according to the Supreme Court. I will credit Mr. Miragliano who says that certainly when you're looking at the totality of the circumstances, I don't quarrel that suggestiveness can be considered at that point as well. But the Supreme Court and this court are explicit that this is a two-step process, that if you have suggestiveness, if you don't have suggestiveness, you're done. If you do have suggestiveness, then you have to look at all of the biggest factors in their totality. And there are bigger factors here that strongly support the reliability of this identification. The opportunity of the witness to see the criminal at the time of the crime, his degree of attention, his level of certainty. Mr. Nguyen testified, quote, I'm sure, when he was asked about it. And not only that, the cross-examination at trial really backfired on the defense when Mr. Nguyen proceeded to identify Mr. Rivera in the courtroom. So, no, we can't only rely on suggestiveness. But I will suggest also, Judge Meadey, that this was, you know, we're not quarreling as the court has acknowledged that this was somewhat suggestive as the district court held. But this was not strongly suggestive. The key thing to remember, I think, is that when he was shown the first photograph, Mr. Nguyen didn't identify Mr. Rivera. He said, I can't recognize him. He's not wearing glasses here. Well, that certainly undermines the idea that, as Mr. Moregliano said, he was cued to recognize a particular person. He held his ground. And then when he was shown a photograph, which is a more casual shot, more normal shot, he's wearing glasses. He said, that's him. And I'm sure. And so, again, I thought the level of certainty was pretty good. I thought the level of certainty was ambiguous. He said, if I'm not mistaken. He did say that on one occasion, which we say could be interpreted as just a preface. But at trial, he testified very clearly, again, not just that he was sure, but also that he saw the man sitting in the courtroom. Can you remind us, sorry, I didn't want to cut off a sentence. Oh, no, please. Remind us the extent of Nguyen's relationship with Rivera before the actual incident. Did they have meals together? Did they spend some time together before? Thank you. I welcome that question because it's important. And I think it's misstated in the reply brief of the defense. And I would like to take a couple of minutes and address that, actually. Now, of course, as Judge Ambrose suggested in a question, the other people who identified Rivera, Dow and Chu, they had extensive prior dealings. They had committed crimes together. And so certainly those are extremely reliable identifications. But what's really important with regard to Rivera, and I think the court relied on this quite a bit with regard to Mr. Nguyen, is that it wasn't the association only on the night of the kidnapping and the murders. It was also the day before. All of these miscreants had lunch together and then met at a house that belonged to Tam Lee, the local ringleader of all this, where the New Yorkers were staying while they were in town. Now we have this factual debate here about was there really a lunch and was Mr. Nguyen really there. And that's what I'd like to address. Nguyen testified very clearly that he went to lunch. He not only said that, he identified the restaurant by name. He said it was a famous restaurant known for its one particular dish, which was chicken pho, P-H-O. So I think it's appropriate for the court to say, all right, there's not substantial likelihood of irreparable misidentification. Let the jury hear all of this. There's a bit more, Your Honor, when it gets into the phone records. Now, Dow testified that- Nguyen was an employee of Lee, is that right? Or what? Nguyen was an employee of Tom Lee, the local person who was associated with the New Yorkers. Why did they bring him in on this? Tom Lee brought him in. He had used him occasionally in the past, according to the testimony, to transport marijuana from New York City to Philadelphia. So he was a construction worker, basically, but he was there to help out his employer and he was asked to serve as the lookout on this occasion. But he met the day before. Now, so they rely on Mr. Dow's testimony. Dow says- Dow actually says they met Nguyen the day before when they came down from New York, that they met at Tom Lee's house that he owned on Wyoming Avenue. But then he's asked, did he go to lunch? And he says, no, he didn't go to lunch. So you have that conflict, which is appropriate for the jury to consider. Dow also said, by the way, that he was on drugs that day, as he was throughout most of this incident. And when he was testifying that Nguyen wasn't at the lunch, it was eight years after that lunch took place. So clearly, the district court has a very strong basis to rely on Nguyen's credibility. Oh, and by the way, Dow described the same kind of restaurant. He said it was a pho restaurant that served the best fried chicken in town. So there's a lot of overlap here. Finally, we get to the phone record. There was actually- the government actually did not present phone records at trial of what happened on that day before, on August 25th. If you look at Exhibit 31, which is in the appendix, it's all about the events of the 26th and 27th. But counsel asked the special agent on cross-examination about that August 25th day. And he said, just sitting there, he said, I don't know where Nguyen was, except we do have a record that Nguyen was in the area of Wyoming Avenue for several hours, which overlaps that area with Tom Lee's house, where both Dow and Nguyen said they met on August 25th. So they stay there that night or they just met there? They met there. And again, the men were backwards in the chronology. Nguyen testified that they went to lunch at the pho restaurant and then he went to the house with everybody, spent 15 minutes there before he had to go to work. Dow had it in the other direction. He said they met Nguyen at the house. Everybody met each other and then they went to lunch without Nguyen. That was his testimony. But however you look at this, you could look at it as a conflict that the jury has to resolve. But you can also look at it as quite a bit of overlapping evidence that Nguyen had an opportunity to see all these men for certainly more than 30 seconds in Brownlee and certainly not involving a carjacking or anything like that, where he had an opportunity to meet them. And then there's the next night when he's with them for hours, when they go through all these atrocious activities that take place of beating the victims and then murdering two of the victims. This is a really strong evidence of reliability. Four years is a long time. Sure, absolutely. Are you aware of any cases where a delay of four years is nevertheless? I would note that there is one case I saw recently, United States versus Williams. It's a 1979 case from the Second Circuit after Neal versus Biggers. It's 596 F second 44. The delay there was 32 months, you know, which is quite considerable. It's worth noting that Biggers itself, which, of course, is the preeminent Supreme Court case on this. Biggers itself then involved a sexual assault where the victim had the opportunity to view the attacker for about a half hour and maybe identification seven months later. And so I think that's also quite notable. But yes, four years is a long time. But you had a man here who really seemed to have an excellent memory and then also had the additional motivation that the court found, which was that he was terrified of these guys. You know, given what had happened and had every reason to remember what they look like and be concerned about them, despite his. Of course, he professed. I want to forget that night. Who would it? But it was clear from the testimony that he did not forget that night. Although he didn't identify him in the first time around when he was shown a picture without glasses. I mean, again, on step one, you're saying the process that was done in 2018 wasn't as good as it should have been. It was unduly suggestive, but he was still nonetheless reliable. Yes, I prefer Judge Prater's word. Make sure it's a piece of of of somewhat suggestive. I think that's the appropriate way to say it. The I think we can just eliminate the adverb and say suggestive. Sure, sure. Of course. This court can look at the pictures. They are very different. And that, of course, is the problem of a suggestive single photo show up. But they're different. The driver's license photo is just a stiff head on bright shot. He's not wearing glasses. The other photo that was shown is a much more normal setting. And he immediately recognized him at that time. So, yes, it was suggestive in the sense that it was a one photo show up. But that's but that does not, in the end, defeat the fact that this should go to the jury. And in front of the jury, of course, Mr. Maragliano, and you see what a capable attorney he is, argued this vigorously. Maybe the jury didn't give as much weight to Nguyen's identification. Maybe the jury instead, as your honor has suggested. So look, Dow and Chu know this guy and they described everything that happened with them. And we're going to rely on that because that is strong evidence. Who knows? But it was certainly reliable enough for the jury to consider. Could you address the scanner issue? Sure. The scanner was told. Counsel, not to do so. You know, you could put the scanner in for certain things, but not identification. I'm sure enough what he does. He says at the at the end, this is not a coincidence. The evidence is confirmation that Jason Rivera was the third perpetrator. The court instructed the jury not to consider that evidence, except with regard to consciousness of guilt. And it was an awkward passage in the prosecutor's statement. If you read the closing in full, the prosecutor did carefully distinguish between the direct evidence and the consciousness of guilt evidence. And the reference to the scanner is at the very end of the full discussion of the consciousness of guilt evidence, which was very strong, starting with the fact that sentences on the scanner. He ends on that. There was no objection that was made at the time. The jury is still considered to follow its instruction. And then what's interesting, and maybe this is why there was no objection. Defense counsel then makes his own argument, which might even be stronger than the prosecutor's argument. The defense counsel in his closing argument goes beyond the court's limiting instruction as well and recalls the testimony of Nguyen and others that Rivera was inside the garage at the time that the assault was taking place. And says, well, how is that possible? If he had a scanner, if he has a scanner, doesn't that show that he really was a lookout? And therefore it undermines the testimony to the contrary from others. So both counsel have strayed beyond the instruction and neither counsel objects. But at the end of the day, the fundamental rule is that a court jury is expected to follow the court's instructions, which couldn't have been clearer. That the consideration of this evidence was limited to proving consciousness of guilt. And there was ample additional evidence from that arrest of consciousness of guilt. Also, just if you look at it, even without the instruction, this is not what drove this case. I don't think any reasonable jury is going to enter a conviction because five years after the event in question, the man has a police scanner, which may or may not be a police scanner. It's harmless even in that sense, but certainly with respect to the jury instruction. If I could take just one minute and talk about the interstate commerce, which is the last issue that the court asked us to address. I would submit that that's not a difficult issue. The testimony from Mr. Merguliano focuses on the testimony that they were going to kidnap one person and not the others. Well, if you look at it very clearly, Mr. Dow in that testimony is using kidnap in the conventional layman sense where we think of somebody being grabbed and taken somewhere else. This goes back to Robert Louis Stevenson and his book Kidnap. What the federal law says is kidnapping certainly is more than that. And it includes seizing and confining as examples of kidnapping in the statute. And so when Dow testifies, he's asked, what are you doing? The three of you are in New York. What are you doing? His answer is we plan on going down, beat them up, rough them up and ask for our money. And then he's asked them, what if they didn't pay? And he says, beat them up some more. So we're dealing with sufficiency of the evidence. The question is, can a reasonable jury taking all reasonable inferences to favor the verdict conclude that this was an attempt to cross state lines in order to commit kidnapping, meaning to seize and confine? And of course, that's the most reasonable inference. What are they going to do? Beat them up on the street in public and keep beating them up in public? No. A reasonable inference, the most reasonable inference, is that they're planning to do exactly what they did, which is take these victims into a confined space, beat them over a prolonged period of time and try to collect the money. That's a kidnapping right on the spot. The fact that they engage in interstate commerce and furtherance of the commission of this crime, of course they did. They drove from New York to Philadelphia to do it. And the evidence was sufficient on that point. We have other points that we make an additional proof of interstate commerce, but I think that's sufficient. Thank you. Thank you, sir. Thank you. I do appreciate counsel's post hoc annotations to the testimony, but the testimony can't be any clearer. When asked specifically, what was the intent? We planned on going down, beat them up, beat them up, roughed them up and asked for our money. The prosecutor even recognized at that time the deficiency in that answer, which is why the next question was, was there any discussion of kidnapping these people? And in response to that, that's when we hear that they were confined, right? They they were confined, ultimately correct. And so isn't that a kidnapping? So so the question is not whether the intent was formed at the time the kidnapping actually occurred. And when I say kidnapping, I'm using that term loosely as well. A federal kidnapping requires that interstate nexus. So even if they came here just traveling from New York to Pennsylvania to commit a crime, again, the intent has to be formed prior to them coming, because otherwise it cannot be reasonably said that the travel was in furtherance of or in the commission of the crime itself. So, like I said before, the the best interpretation of the evidence was that they came down to collect the debt, which is exactly down from New York to Pennsylvania to collect the debt by means of. Roughing them up to the extent necessary to collect the debt, and that usually means that you have to somehow confine them to be. I respectfully disagree, because then that's we wouldn't have an extortion extortion, a collection of credit crime to be charged. Right. So there are two distinct crimes here. One is the collection of an extortionate debt. And then the other is the kidnapping. And what I'm saying is that the kidnapping intent must have been formed prior to them coming to Pennsylvania here in New York. And you intend to drive to Philadelphia to beat these guys up. Doesn't that also doesn't that infer that you intend to confine them so that you can beat them up? Because you don't have to necessarily kidnap anyone in order to rough them up. You just don't have to do that. I understand that the argument was made that, well, you know, it necessarily requires that you would you wouldn't do it on the street. But but I mean, that we're just adding things now. And that's where we're looking. When we look at the plain reading of the record, that's not what it is. And if we look at what's charged, that's not what it is. You know, there are two distinct crimes charged and there are two distinct two separate conduct is required in order to prove those two distinct crimes. And that's what is important here. I would like to address very briefly, Mr. Nguyen's identification and the reliability and how, you know, he how much time he had to actually view Mr. Rivera. Well, the lunch was disputed. There was there was the phone evidence was presented to the jury and there was proof that there was no phone evidence tying Mr. Nguyen or putting Mr. Nguyen in the in the area of the restaurant at the time that these individuals were in fact there. So that was his testimony was contradicted by objective evidence. In addition to that, he was not with them for hours. Mr. Nguyen was not with these other individuals for hours. In fact, he was he was tasked with being outside acting as a lookout, whereas even Special Agent Baber testified that Mr. Rivera, if he was there, would have been inside the garage with a mask on. And there were these brief fleeting moments that they may have interacted, at least according to Mr. Nguyen's testimony and crediting his testimony. But those brief interactions cannot be said to be the same as, you know, having a spent hours with someone. I mean, we have spent more time together, most likely than than even crediting Mr. Nguyen's testimony he spent with Mr. Rivera, because if he was not at the lunch, he was not with Mr. Rivera. If he didn't that even with that 15 minutes at the Wyoming Avenue address, still not enough four years later to make a an accurate identification. And finally, with respect to the scanner, the scanner was used to essentially bolster that identification. And that is highly important here when we think about whether or not this was harmless error. Okay, thank you. Thank you so much.